* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission affirms with some modifications the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as: *Page 2 
 STIPULATIONS
1. The parties are subject to the N.C. Workers' Compensation Act.
2. An employee-employer relationship existed between the named employee and named employer.
3. The defendant is self-insured, and Risk Management Services, Inc. is the third-party administrator.
4. Plaintiff's average weekly wage will be determined from an Industrial Commission Form 22 Wage Chart to be provided by defendant with supporting wage information.
5. Plaintiff sustained a compensable injury on December 19, 2003 which arose out of and in the course of his employment with defendant-employer. Defendant accepted plaintiff's claim pursuant to a Form 63 filed with the Commission on March 16, 2004.
6. The issues before the Full Commission are whether plaintiff is entitled to additional benefits or medical treatment for injuries sustained on December 19, 2003; whether plaintiff sustained a second injury by accident on or about November 10, 2004 and, if so, to what benefits is plaintiff entitled; and whether plaintiff is entitled to reasonable attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1 and Rule 802.
7. Stipulated Exhibits:
 1. Medical Records;
 2. Defendant's Answers to Plaintiff's Interrogatories;
 3. I.C. No. 394415 Forms; and
 4. I.C. No. 481729 Forms.
 * * * * * * * * * * * *Page 3 
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 52 years old. Plaintiff graduated from high school and worked in construction. Plaintiff joined the United States Army and worked as an auto mechanic. He was discharged as a sergeant after his four year enlistment. Plaintiff returned to construction work after his discharge from the Army.
2. Thereafter, plaintiff began driving trucks. He drove for 18 years prior to starting work for defendant-employer. Plaintiff worked for defendant-employer for five years prior to his injury in December 2003.
3. Plaintiff's duties each day included picking up his truck and the delivery schedule at the Distribution Center located in Dunn, North Carolina, and then driving to specified stores. Plaintiff's delivery routes took him throughout eastern North Carolina. Plaintiff was the only person in the truck when he was on his delivery routes.
4. On December 19, 2003, plaintiff was injured while in the course and scope of his employment with defendant-employer. Plaintiff does not remember how the accident happened. Medical records show that plaintiff was unloading the truck and a 20-pound case of Gatorade fell from the truck, striking plaintiff in the forehead. Plaintiff fell over and struck his head on a metal pallet jack, rendering him unconscious for approximately five minutes. When EMS arrived plaintiff had a decreased level of consciousness. Plaintiff remembers waking up in the hospital.
5. Plaintiff was kept overnight at New Hanover Regional Medical Center. He was diagnosed with a concussion and neck strain and discharged with instructions to follow up his treatment. Plaintiff was kept out of work and did not return to work until August 2004. Plaintiff's workers' *Page 4 
compensation claim was accepted by defendant-carrier, however defendant-employer delayed payment for three months. Defendant paid temporary total disability compensation to plaintiff from December 19, 2003 through August 3, 2004 when plaintiff returned to work with defendant-employer.
6. Plaintiff presented to Dr. Bruce Solomon, a neurologist, on February 4, 2004 on referral from his chiropractor. Plaintiff complained of difficulties speaking, severe headaches, pain behind his right eye, muscle spasms and memory problems. Dr. Solomon diagnosed post-concussive syndrome, prescribed speech therapy and requested that a neuropsychological examination be performed on plaintiff.
7. Plaintiff returned to Dr. Solomon on March 31, 2004. Plaintiff again complained of right retro-orbital pain, shoulder, and neck pain. Dr. Solomon requested an MRI of plaintiff's brain to rule out any tumors. He also changed plaintiff's medication to add Amtriptyline for the headaches.
8. Defendant assigned a nurse case manager, Linda Christopher, to plaintiff's case. She arranged for plaintiff to be examined by psychologist Verne Schmickley, Ph.D. Ms. Christopher did not coordinate an appointment with a neuropsychologist as recommended by Dr. Solomon.
9. Dr. Schmickley was provided plaintiff's medical records prior to the examination. Dr. Schmickley examined plaintiff on March 24, 2004 by performing a series of tests including the Beck Depression Inventory, Minnesota Multiphasic Personality Inventory, 2nd edition, Word Memory Test, Shipley Hartford Institute of Living Scale and Validity Indicator Profile.
10. After reviewing all of the test results, Dr. Schmickley was confused about plaintiff's presentation and noted that he needed more data, and would like to have had the opportunity to perform more tests on plaintiff. Dr. Schmickley anticipated that Dr. Solomon would perform more testing or that a neuropsychologist would see plaintiff to help determine the cause of plaintiff's condition. *Page 5 
Dr. Schmickley diagnosed a somatoform disorder (conversion disorder) based on plaintiff's responses to the testing and his severe presentation. Dr. Schmickley found plaintiff's impaired speech to be "puzzling."
11. Dr. Solomon was under the mistaken impression that Dr. Schmickley was a neuropsychologist; however, Dr. Schmickley is a psychologist and is not qualified as a neuropsychologist.
12. Ms. Christopher attended plaintiff's next appointment with Dr. Solomon on May 13, 2004. Dr. Solomon recommended that plaintiff undergo a formal driving evaluation before he released plaintiff to return to his job as a driver. Dr. Solomon stated that plaintiff was seen by an occupational therapist for a driving evaluation, but noted that the therapist referred him to "people that would test him for driving an 18 wheeler."
13. Dr. Solomon released plaintiff on July 29, 2004. Dr. Solomon noted that plaintiff had not been tested by the Department of Transportation with regard to driving an 18 wheeler. Dr. Solomon stated that he released plaintiff despite ongoing complaints of headaches. He recommended that plaintiff undergo testing by DOT prior to returning to work as a driver. Dr. Solomon released plaintiff to return to work on August 2, 2004 with the provision that he pass the DOT test.
14. On August 3, 2004 plaintiff returned to work as a driver for defendant-employer, as he was instructed by the nurse case manager. Plaintiff did not take a driving test utilizing an 18-wheeled truck. His driving test consisted of driving a passenger car through a neighborhood. This test in no way reflected the conditions under which plaintiff regularly worked. Plaintiff had to call in sick when he was unable to work his full shift due to headaches. *Page 6 
15. Plaintiff had difficulties after his return to work. A driver is required to punch codes into a machine in the truck. This punch system notifies the dispatcher when the truck is in operation. Plaintiff had difficulties performing this task. Plaintiff got lost on his deliveries to stores that he had been to many times before. Plaintiff called his friend Norman Helms for directions. Mr. Helms is a retired driver for defendant-employer and knew the routes and the stores where plaintiff made deliveries. Plaintiff had to write down directions from Mr. Helms to get to the stores. Plaintiff called Mr. Helms almost daily for assistance.
16. Plaintiff attempted to inform defendant-employer of his problems. He was told that if he took any more time off "they would have to give him time off". Because plaintiff was fearful of losing his job, he stopped going to the doctors. Defendant-employer did not authorize any further doctor appointments after his return to work in August 2004. Plaintiff used his wife's health insurance to pay for his treatment.
17. Plaintiff was finally examined by a clinical neuropsychologist, Dr. Elizabeth Gamboa, on September 13 and 23, 2004, after a referral from his family doctor, Dr. Cammie Fulp. Dr. Gamboa noted that plaintiff's speech was unusual and not consistent with traumatic brain injury. In her medical notes Dr. Gamboa further stated her opinion that any cognitive problems plaintiff might have were not related to the traumatic brain injury he sustained on December 19, 2003.
18. Plaintiff returned to Dr. Solomon on September 23, 2004. Plaintiff reported that he was working 15 hours a day and that he was having headaches and neck pain. Dr. Solomon requested cervical spine x-rays to rule out the cause of the headaches. *Page 7 
19. Dr. Solomon examined plaintiff on October 22, 2004. When plaintiff presented with complaints of dizziness, Dr. Solomon referred plaintiff to one of the university centers for treatment of chronic pain.
20. Although he returned to work in August, 2004, plaintiff did not undergo a DOT physical until October 28, 2004. He reported to US Healthworks, which does the majority of the physicals for the drivers of defendant-employer. Plaintiff was initially seen by a physician who was brought in from a temporary agency and subsequently passed the DOT physical after a second evaluation completed by Dr. Pamela Jessup.
21. Plaintiff was taken out of work by his family physician, Dr. Fulp, on February 10, 2005. In a note on that date Dr. Fulp stated that plaintiff would be out of work for an undetermined amount of time for treatment and management of diabetes, depression and cervical radiculopathy. In a letter dated December 9, 2004, Dr. Fulp expressed the opinion that plaintiff had suffered a traumatic brain injury.
22. Because plaintiff's condition was not improving, his family arranged for him to be evaluated by neuropsychologist Robert Stein, Ph.D., on March 15, 2005. Dr. Stein is located in Pennsylvania and his practice focuses on patients with traumatic brain injuries. Dr. Stein reviewed plaintiff's medical records, as well as the psychological evaluations by Drs. Gamboa and Schmickley, prior to his one and a half hour examination of plaintiff. Plaintiff's main symptoms were chronic headache, confusion and memory problems, and neck pain. Based on Dr. Stein's evaluation, plaintiff's clinical presentation was consistent with mild brain injury. He further stated that plaintiff's clinical presentation did not indicate malingering. Based upon the clinical reporting, the medical records, the opinions of the physicians that evaluated plaintiff at the time of the accident, the documented loss of consciousness, and the symptoms he was experiencing, Dr. Stein diagnosed plaintiff with neurocognitive *Page 8 
disorder secondary to head trauma and traumatic brain injury. Dr. Stein has treated approximately 1,500 people with mild head injuries. More than 98% of these patients, like plaintiff, had normal MRI and CT scans. Dr. Stein explained that blows to the head typically do not cause damage that can be seen on an MRI. When a PET scan was performed on six of his patients, positive results were found. However, Dr. Stein stated that insurance companies do not normally authorize PET scans as they are very expensive.
23. Plaintiff returned to North Carolina and continued to treat with Dr. Fulp, who referred him to Dr. Finkle at UNC Chapel Hill. Dr. Finkle referred plaintiff to Dr. Thomas Gualteri, a neuropsychiatrist. Dr. Gualteri first examined plaintiff on October 3, 2005. The results of a personality test suggested plaintiff had a conversion disorder, which is a type of somatoform disorder. Dr. Gaulteri stated that there was an indirect relationship between the conversion disorder and plaintiff's December 19, 2003 accident. Dr. Gualteri believed that plaintiff suffered from conversion disorder and some mild traumatic brain injury.
24. Dr. Gaulteri was of the opinion that it is unlikely that plaintiff will find employment in the competitive sector, and, if he does, it is unlikely that he would be able to stay in the job for more than a few hours. Dr. Gaulteri did not believe that plaintiff would be able to return to work as a truck driver and is probably only capable of working in a sheltered environment. Dr. Gaulteri, like all of plaintiff's physicians, did not find any signs of malingering in plaintiff's presentation.
25. Dr. Gualteri explained that although damage is not evident in plaintiff's neurological examination, people who have concussions experience some small cellular changes in the brain. Dr. Gualteri further explained that a brain can normally compensate for these changes. A 50-year old man with diabetes is capable of recovering; the recovery process, however, may be longer and drawn out. *Page 9 
Dr. Gualteri stated that plaintiff's pre-existing conditions, diabetes, smoking, and obesity made him more vulnerable to a longer, more drawn out recovery process. Furthermore, during this long recovery period, plaintiff's psychological and emotional issues coalesced and manifested themselves in plaintiff's constellation of symptoms.
26. Dr. Stein was deposed by the parties on July 11, 2007. Dr. Stein did not agree with Dr. Schmickley that plaintiff had somatoform or depressive disorder. Prior to his deposition Dr. Stein reviewed Dr. Gualtieri's report which was completed after his own report. Dr. Stein largely agreed with the opinions of Dr. Gualtieri, but characterized plaintiff's somatoform issues as "somatoform features rather than a full-fledged somatoform pain disorder." Dr. Stein stated: "While Dr. Gualtieri opined the relationship between the injury and symptoms is indirect, I would say from at least the chronic pain, his chronic headaches, neck, and shoulder pain that they are direct." Dr. Stein also causally related plaintiff's cognitive disorder to the traumatic brain injury. Dr. Stein recommended a functional capacity evaluation and felt that plaintiff needed ongoing treatment for chronic pain and vocational ongoing evaluation and treatment to gradually get plaintiff back to work.
27. Sonya Montgomery, a board certified family nurse practitioner and psychiatric mental health clinical specialist, treated plaintiff in association with Dr. Gaulteri. Ms. Montgomery stated to a reasonable degree of medical certainty that plaintiff's condition was causally related to the injury. Ms. Montgomery further felt that plaintiff's work injury triggered development of the conversion disorder.
28. The Commission gives greater weight to the expert opinions of Dr. Stein and to Dr. Gualtieri to the extent that his opinions are consistent with those of Dr. Stein, than to the opinions of Dr. Schmickley and Ms. Montgomery. Therefore, the Commission finds by the greater weight of the *Page 10 
evidence that plaintiff's psychiatric conditions are causally related to the compensable injury by accident and are therefore compensable.
29. Dr. Gualteri took away plaintiff's license to drive 18-wheeled trucks. Defendant has not offered plaintiff alternate work. Plaintiff continues to have headaches and dizzy spells. He is encouraged to drive short distances by Dr. Gualteri and Ms. Montgomery. He shares driving duties with his wife.
30. Norman Helms testified that he has known plaintiff for years. He worked with plaintiff as a tandem team driver for fifteen years prior to joining plaintiff at defendant-employer. Mr. Helms visited with plaintiff within a few days of the accident and has seen him almost daily since that time. He noticed that plaintiff's speech was slurred and there has been no improvement to his speech since the time of the accident. Mr. Helms stated that plaintiff related to him that he wanted to go back to work. Mr. Helms saw plaintiff cry from the pain he was experiencing, and felt plaintiff seemed to be depressed.
31. Velonda Cannizzaro, plaintiff's wife, noticed a change in plaintiff after the accident. He had difficulty recognizing family members and could not locate items in the house. Plaintiff's speech was slurred or he stuttered. Plaintiff also had difficulties putting together sentences. Mrs. Cannizzaro relied upon Mr. Helms and her neighbors to keep an eye on plaintiff while she was at work.
32. At the time of the hearing before the Deputy Commissioner, plaintiff continued to be written out of work by his doctors. Defendant-employer denied plaintiff's claim after his unsuccessful August 2004 return to work. Since February 10, 2005 when Dr. Culp took plaintiff out of work, plaintiff has been incapable of work in any employment as a result of his compensable injury by accident on December 19, 2003. *Page 11 
33. Plaintiff asserted a second claim alleging a November 10, 2004 specific traumatic incident which caused increased head and neck pain. However, no evidence has been submitted in regard to any treatment received or further documenting any alleged November 2004 incident.
34. Defendant's defense of this claim was not the result of stubborn, unfounded litigiousness.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On December 19, 2003, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer in which he sustained a closed head injury. N.C. Gen. Stat. § 97-2(6).
2. As a result of his compensable injury and the physical consequences thereof, plaintiff was temporarily totally disabled from December 19, 2003 until August 3, 2004. Defendant has already paid plaintiff compensation for this period of disability.
3. As a result of his compensable injury of December 19, 2003, and supported by the testimony of his treating physicians, plaintiff has been unable to work in any capacity due to his closed head injury since February 10, 2005, after his unsuccessful return to work. Plaintiff's physical injury and psychological maladjustment to his physical injury have rendered him incapable of earning wages with defendant-employer or any other employer in a job that is suitable based upon his age, education, vocational history and residual functional capacity. Plaintiff's psychiatric injuries, superimposed on his *Page 12 
pre-morbid lack of coping skills, are compensable. Calloway v. MemorialMission Hosp., 137 N.C. App. 480, 528 S.E.2d 397 (2000).
4. Plaintiff is entitled to payment by defendant of total disability compensation at the rate of $470.77 per week beginning February 10, 2005 and continuing until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
5. To the extent the same is reasonably designed to effect a cure, give relief or lessen the period of disability, defendant-employer shall pay all medical expenses incurred by plaintiff as a result of his compensable injuries including treatment for his headaches, vertigo, chronic pain and head injury as well as psychiatric/psychological treatment. N.C. Gen. Stat. § 97-25.
6. There is substantial likelihood that plaintiff will require further medical treatment as a result of his compensable injuries. N.C. Gen. Stat. § 97-25.1.
7. Defendant's defense of this claim was not the result of stubborn, unfounded litigiousness, and plaintiff is not entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1. Sparks v. Mountain BreezeRestaurant, 55 N.C. App. 663, 286 S.E.2d 575 (1982).
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendant shall pay to plaintiff total disability compensation at the rate of $470.77 per week beginning February 10, 2005 and continuing until further Order of the Commission. Portions of this amount have accrued and shall be payable in a lump sum. These amounts are subject to an attorney's fee. *Page 13 
2. Defendant shall pay all past and future medical expenses incurred by plaintiff as a result of his compensable injury including psychiatric and psychological treatment.
3. Defendant shall pay directly to plaintiff's counsel 25% of the past due compensation awarded in Paragraph 1 above. Thereafter, defendant shall pay directly to plaintiff's counsel every fourth check.
4. Defendant shall pay the costs.
This 13 day of June, 2008.
S/__________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/__________________________ DANNY LEE McDONALD COMMISSIONER
DISSENTING:
 S/__________________________ DIANNE C. SELLERS COMMISSIONER *Page 14